# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | : CHAPTER 7 |
| MERRY B. GUBEN | : |
| DEBTOR(S) | : BANKRUPTCY NO. 07-14703 SR |
| MERRY B. GUBEN | : |
| PLAINTIFF | : |
| vs. | : |
| UNITED STATES OF AMERICA | : |
| DEFENDANT | : ADVS. NO. 07-407 |

# OPINION

BY: STEPHEN RASLAVICH, CHIEF UNITED STATES BANKRUPTCY JUDGE.

**Introduction**.

The Debtor, Merry B. Guben, has filed suit against the United States seeking a determination that certain of her tax liabilities are dischargeable. The Government opposes discharge. A trial was held June 24, 2008. Following it the Court took the matter under advisement. For the reasons set forth herein, judgment will be entered in favor of the Government and against the Debtor.

*The Tax Liability and*
*the Government's Position*

The Debtor's Schedules estimated her federal tax liability to be $300,000. *See* Schedule F. In her Complaint that figure was refined to $319,271. *See* Complaint, ¶ 4. It is said to represent unpaid income taxes for 1983, 1986, and 1988 through 1995. *Id*. The Government, for its part, agrees the number is correct, however it does not contend that any tax is due for 1986. The parties' disagreement is over whether the Debtor has attempted to evade payment of these

taxes. The IRS contends that the Debtor has done so and, as a result, her tax debt should not be discharged.

*Applicable Law*

As a general principle, tax obligations incurred more than three years before the date of a bankruptcy filing are dischargeable under § 523. *In re Schlesinger*, 290 B.R. 529, 535 (Bankr. E.D. Pa. 2002) *citing In re McKay*, 957 F.2d 689, 691 (9th Cir. 1992). Among the exceptions to this general principle are provisions found in § 523(a)(1)(C):

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt–
> (1) for a tax or a customs duty--
> …
> (C) with respect to which the debtor made a fraudulent return or *willfully attempted in any manner to evade or defeat such tax*.

11 U.S.C. § 523(a)(1)(C) (1994) (emphasis added). The Third Circuit has explained that willful tax evasion under § 523 is comprised of two elements: first, conduct (that the debtor sought "in any manner to evade or defeat" tax liability); and second, knowledge (that the attempted evasion of payment was done "willfully") *In re Fegeley*, 118 F.3d 979, 983 (3d Cir.2000). Exceptions to discharge are to be strictly construed in favor of the debtor. *Id.* The burden of proving that a debtor's tax liabilities are nondischargeable under § 523(a)(1)(C) is on the United States. *See Berkery v. Commissioner*, 192 B.R. 835, 840 (E.D.Pa.1996), *aff'd*, 111 F.3d 125 (3d Cir.1997). This is so even where the action has been commenced by the Debtor. *In re Scarpiello*, 240 B.R. 203, 208 (Bankr.E.D.Pa.) It is the Government's burden to prove its case by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661 (1991). The Court will assess the conduct and knowledge elements in turn.

*The Debtor's Conduct*

2

The conduct of which the Government complains is threefold. It consists of 1) failure to remit tax payments on a current basis, 2) the discretionary expenditure of monies that should have been remitted as tax payments, and 3) the concealment of assets.

The Debtor (and her husband) first encountered tax problems beginning in 1983. The problems related to Mr. Guben's 1981 sale of his business. Acting on the advice of their accountant, the Guben's apparently reported income from the transaction as an installment sale on their jointly filed tax return. Their position was challenged by the IRS in subsequent audits. Their returns for 1982 and 1983 return were "examined" (i.e., audited) and additional taxes were assessed. *See* P-2, IRS Account Transcript for 1983. Assessments for the year 1983 remain unpaid and have accrued substantial interest and penalties.[1] *Id*.

Beginning in calendar year 1988, and for seven years thereafter, the Debtor and her husband filed tax returns without remitting any tax due.[2] Taxes for those years have gone unpaid and have likewise accrued interest and penalties. *See* P-3 through P-10, IRS Account Transcripts for 1988 - 1995.

As a result of the foregoing, a principal tax debt of roughly $60,000 has grown to upwards of $320,000. The Government argues that the Debtor's failure to remit tax payments, contrasted against her ability to pay something during the relevant time frame and her concealment of assets, are probative of evasion. The Court agrees.

"[A] debtor's failure to pay his taxes, alone, does not fall within the scope of § 523.

---

[1] *See* 26 U.S.C. §§ 6601 (providing for assessment of interest on underpaid, non-paid, or taxes paid by extension, 6621 (setting forth applicable rate of interest), 6622 (providing that interest compounds daily), 6672 (providing for assessment of penalties)

[2] To the extent any tax was paid, it was *de minimis* and done via withholding. *See* IRS Transcripts

*Fegeley*, 118 F.3d at 983 quoting *In re Haas,* 48 F.3d 1153, 1158 (11th Cir.1995) Thus, proof of non-payment does not equate to proof of *evading* payment. Instead, nonpayment is but a part of the totality of conduct relevant to a determination of whether or not the debtor willfully attempted to evade or defeat taxes." *Id. citing Dalton v. IRS*, 77 F.3d 1297, 1301 (10th Cir. 1996). As noted, the Government argues that the Debtor's use of her discretionary income, coupled with her failure to disclose certain assets prepetition to the IRS and postpetition to the Bankruptcy Court, constitutes proof of evasive conduct. Again, the Court agrees.

*Spending Habits*

The IRS contends that instead of paying taxes "the Debtor chose to spend her money on education, charity, vacations and art." Trial Brief, ¶ 8. Mrs. Guben's testimony confirms this. She admits to spending about $5,000 yearly on travel. T,61. She further admits to spending approximately $6,500 on artwork. T,67. Another $6,367 in charitable donations was made for 1994. T-58; *see also* D-10, 1994 Tax Return with attached Form 8283. Finally, the Debtor paid toward the education of her husband and herself. Specifically, during the relevant time period, Mr. Guben obtained a doctorate degree toward which Mr. and Mrs. Guben paid four to five thousand dollars per year over four years. Mrs. Guben, meanwhile, obtained a law degree and paid the first year's tuition herself. T-83, 121.

*Concealment of Assets*

Besides spending money on non-essentials, it is the Government's contention that Mrs. Guben failed to disclose an extensive art collection when trying to settle the government tax claim eight years ago, and again in trying to discharge that claim in this bankruptcy case. The evidence supports this contention.

The Third Circuit has observed that "Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation." 118 F.3d at 983 *citing Dalton,* 77 F.3d at 1301(quoting *Spies v. United States*, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418, (1943)). Indeed, this is explained by the statute's use of the prepositional phrase "in any manner" to describe the myriad methods of potential tax evasion. Affirmative conduct is not required; rather, § 523(a)(1)(C) encompasses acts of culpable omission as well as acts of commission. *Fegeley*, 118 F.3d at 984.

On Schedule B, a Debtor is required to list personal property as of the date of the filing of this bankruptcy. Item #5 on that list asks the Debtor to state whether she owns any "books, pictures and other *art objects* …" Mrs. Guben indicated none. *See* Ex. D-12A (emphasis added). At a hearing on a Motion for Summary Judgment in this case, the Government offered evidence that the Gubens owned an extensive art collection. While the Court denied summary judgment, it did order the Debtor to amend her schedules to reflect the art assets. Mrs. Guben did so, itemizing 34 separate pieces of artwork having an estimated cost value of aproximately $6,500. *See* Ex. 12B.

It appears, moreover, that this was not the first time that the Debtor failed to disclose her art assets. At trial, the Government offered into evidence a copy of the Gubens' Offer in Compromise (OIC) of November 2000. Ex. D-11. An OIC is an offer to settle a federal tax liability and may be premised on an inability to pay. *See* 26 C.F.R. § 301.7122-1(b)(2). It must, therefore, be supported by a financial statement. IRS Form 433-A serves that purpose. On it the taxpayer must list, among other things, all assets and liabilities. Nowhere on the form which the

Gubens submitted is artwork listed among their assets.

All of the above conduct raises serious questions as to the Debtor's motivations.

*The Debtor's State of Mind*

The Third Circuit "ha[s] interpreted 'willfulness', for purposes of § 523 (a)(1)(C), to require that a debtor's attempts to avoid tax liability were 'voluntary, conscious, and intentional.'" *Fegeley*, 118 F.3d at 984 *citing In re Birkenstock*, 87 F.3d 947, 952 (7th Cir.1996). In order to prevail the Government need establish only that the Debtor: (1) had a duty to pay the assessed tax liability; (2) knew of the duty; and (3) voluntarily and intentionally violated that duty. *Id.*

The testimony of Mary Biddle, bankruptcy specialist for the IRS, established that the Government assessed a tax liability against the Debtor for 1983 and 1988 through 1995. *See* T,11 - 23; Ex. D-1 through D-9. On cross-examination, the Debtor admitted that she knew she had a duty to pay taxes. T,52-53. This leaves for the Court the question of whether the Debtor voluntarily and intentionally violated that duty.

A taxpayer's state of mind may be inferred from his or her conduct. *See U.S. v. Weiss,* 2000 WL 1708802 *3 (E.D.Pa.) ("A court may properly consider a debtor's conduct after the return and payment were due to determine whether the evasion of payment was willful."); *see also U.S. v. Voigt,* 89 F.3d 1050, 1090 (3d Cir.1996) (explaining that intent to evade payment of tax may be inferred from circumstances).

The Government argues, correctly, that Mrs. Guben's intent to evade may be inferred from both her spending on non-essentials and concealing assets. The Debtor's attempt to refute the Governments's proof consisted, essentially, of attempts to focus the Court's attention

6

elsewhere. Cross-examination of Ms. Biddle was aimed at showing that taxes due for the years prior to 1988 were ultimately paid (except, that is, for 1983) and that since 1995 all taxes have been paid in full and on time. T,37-46. As to the *un*paid taxes, Mrs. Guben emphasizes that she and her husband made two offers to settle and that they twice agreed to extend the statute of limitations to accommodate the Government. T,85, 39,40  The Debtor also stresses that after she and her husband were audited by the IRS they borrowed money and liquidated real estate and investments to pay down their taxes. T,74-75.

      The transcripts reveal that of the nine years for which they still owe taxes, the Debtor and husband filed timely returns on but three occasions. When pressed for an explanation as to why she and her husband filed their many extension requests over they years, Mrs. Guben testified that this was done in order to accommodate their accountant. T,79. After the IRS rejected the couple's last offer to settle—an offer which the IRS kept under consideration for *six years*—the Debtor testified that she felt that there was no point in further trying to settle with the Government. T,89. She believed that this bankruptcy case and the related dischargeability action were her last hope. T,90.

      The Court finds the Debtor's arguments to be, for the most part, unpersuasive. What matters here are the years 1988 through 1995 (T, 149): an eight year period during which the Debtor enclosed no payment whatever with her tax returns. It is clear that she had the means to and simply chose not to. It is reasonable to infer from that conduct that Mrs. Guben was trying to avoid paying taxes. Indeed, at trial the Government pressed this point with Mrs. Guben, seeking her admission that she knew that she could have been paying down her tax debts when she decided, instead, to buy works of art:

7

Q. You could have decided not to buy art and instead pay down your taxes?

A. I suppose I could have paid taxes.

Q. So you chose to buy the art rather than pay your taxes?

A. No, I wouldn't characterize it that way at all. The way I viewed that period of time was that *the point of the things was to come to a resolution because without a resolution it didn't really matter.* I mean it's not that it didn't matter whether or not I pay taxes, I was paying current taxes at that point. But I think to the extent that any payments really would have little or no effect on the overall question of *whether or not we could come to a reasonable number.* I mean it would be - - I didn't say all of them go out and buy this thing because I'd [*sic*] don't want to pay my taxes. It was never like that. I never did that. I never said oh I'm going to go to my nieces graduation in Kansas City so I don't have to pay money on my taxes I can use that as an excuse, it wasn't like that. It was never like that.
…

Q. You owed your taxes for 1983 and 1988 to 1995?

A. Those are the taxes that the IRS says are still outstanding, yes.

Q. And those taxes are based on how much money you and your husband made?

A. Well I'd [*sic*] know that they started out with tax returns that we filed and we showed a certain amount of money, or the account [sic] determined a certain amount of money that we owed and then some times I guess for whatever reason there was another assessment after that because maybe the IRS had a different idea of what, how something was calculated I don't know. I don't know what the IRS based their numbers on exactly.

Q. For 1988 to 1995 there was no audit, correct?

A. No that I recall, no. I don't remember anybody not like it was in '83, '84 or whenever it was in the early '80s.

T, 94-96 (emphasis added).

The "resolution" of which the Debtor speaks in the above exchange alludes to the still unpaid tax liability resulting from the sale of her husband's business. The IRS had assessed liability in amounts different than determined by the Gubens' accountant and they did not know how the IRS had arrived at its figures. Instead of bringing closure to the issue through administrative procedures, or even an appeal of the Service's decision, the Debtor and her husband simply stopped paying taxes altogether. Their thinking apparently was that the original amount due had compounded to such a substantial number that any tax payments would not materially amortize the amount due. They apparently decided that the Government would have to "come to a reasonable number" before they would start paying their taxes again. That seems to have been a counterproductive strategy then, and it is a very unpersuasive argument for present purposes.

The Debtor operates under the mistaken notion that she could offset her unpaid taxes for 1988 through 1995 against any unresolved debt dating back to the early 1980's. There is no legal basis for this; the duty to pay ongoing income taxes is unconditional. *See* 26 U.S.C. § 1. That is not to say, however, that the IRS is always right: there are procedures—both administrative and judicial—for review of tax assessments. *See* www.irs.gov (explaining internal hearing procedures); *see also* 26 U.S.C. § 6214(a) (providing tax court jurisdiction over appeals of assessments). The record does not demonstrate that either the Debtor or her husband fully availed themselves of these processes. Notwithstanding, the Court might nevertheless ascribe some good faith to the Debtor had she escrowed an amount of her income equal to her tax liability while battling on with the government. However, Mrs. Guben did not do so. She spent that income on other priorities. Contrary to what she may insist, the Debtor rather clearly

appears to have been consciously avoiding her tax payments.

Equally if not more illuminating as to Mrs. Guben's state of mind is her conduct relative to the couple's art collection. When Mrs. Guben tried to settle with the IRS, she failed to disclose this asset.[3] She did this a second time when she filed this bankruptcy. The Government contends that this was no oversight; rather, it was intended to conceal an extensive collection from the Service. The evidence supports this contention. To demonstrate that the Debtor and her husband were art collectors, the IRS introduced two magazine articles. The first is entitled "*Home* is Where the *Art Is*" (emphasis in original) and is undated. Ex. D-18. The article's subject is Mark Sherman, a Philadelphia real estate developer. The article describes his plans to develop certain former industrial sites in the East Falls section of the city. The development was to be known as the Mills at East Falls and was to contain 26 loft apartments situated within an artistic community. While the article does not mention the Gubens, it contains a photograph of their loft apartment in Mr. Sherman's development. T,110-111. The Debtor identified the furniture and artwork appearing in the photograph as hers. T, 98-102.

A second article about the Mills at East Falls *does* reference the Gubens. It discusses the collaboration of Mr. Guben with Mr. Sherman to develop the project along the lines explained in the first article. The apartments would be set inside a crafts village with galleries, studios, and restaurants. Ex. D-19. Entitled "Lofty Dreams," the article features the loft apartment in which the Gubens lived. According to the article, the Debtor and her husband set about decorating it with "a sizeable collection of art furniture, paintings and crafts" albeit within

---

[3] The Court does not give Mrs. Guben credit it might otherwise have for having to wait six years for a response to her OIC, because the OIC misrepresented her financial condition. *See* 26 C.F.R. § 301.7122-1(b)(3)(iii),(c) (explaining that IRS has discretion to reject offer if acceptance would "undermine compliance by taxpayers with the tax laws.")

their budget. *Id.* Some pieces they paid for over time and others they obtained by barter. The Debtor confirmed that the pieces of art and furniture featured in the article belonged to her and her husband. [4] T, 98-102.

These articles demonstrate that artwork is central to the lives of the Debtor and her husband. Indeed, it is clear that the Gubens are serious art collectors. For this reason, the Court squarely addressed to the Debtor the question of how it was that she would neglect to list artwork on her offer in compromise and on her bankruptcy schedules:

> Q. You prepared the offer and [*sic*] compromise, isn't that what you said?
>
> A. Yes, I did.
>
> Q. What explanation do you have for the fact that there's no artwork listed on either the offering [*sic*] compromise or on the original bankruptcy schedules that you filed?
>
> A. Yes. Well in the original 2000 one at that point my feeling was or my understanding of what we had and the condition it was in and what art I had at that point before 2000 it was worth little to nothing actually because most of the furniture was - -
>
> Q. I'm talking about the art.
>
> A. Yes. The art was - - some of the paintings that Jay Guben had for many years were not in good condition. Like I said the one we tried to get cleaned was destroyed. It just didn't - - I don't know, I just didn't think it was valuable in the same way that stock is valuable or a house is valuable or a car you can sell or you know that that stuff has a particular kind of value or particular market. What we had was, it didn't seem to me to be like that. I guess it didn't seem to either one of us to be like that.

T, 103-104.

---

[4] The photograph from the second article is of the same loft apartment featured in the first. The shot is taken from a different angle and the Debtor noted that some of the furniture has been rearranged. T,98.

11

The Court finds the Debtor's explanation to be without credibility. Moreover, whether or not Mrs. Guben believed that her artwork lacked value or a ready market is irrelevant. The instructions on Schedule B are clear: she was to list all personal property of whatever kind." *See* Schedule B; 11 U.S.C. § 521(a)(1)(B)(i); B.R. 1007(b)(1); Official Form 6; *see also In re Okan's Foods, Inc.*, 217 B.R. 739, 752 (Bankr.E.D.Pa.1998) (stating that debtor has affirmative duty to fully disclose all asset and interests in property). The existence of an item of property and the value of that property are two different concepts. Because she owned artwork, Mrs. Guben was required to disclose it and then state its value. She had no discretion to do otherwise. *See In re Darby*, 376 B.R. 534, 541 (Bankr.E.D.Tex.2007) (revoking discharge for failure to disclose artwork); *In re Unger*, 333 B.R. 461, 469 (Bankr.M.D.Fla. 2005) (denying discharge for failure to disclose artwork); *In re Bursztyn*, 366 B.R. 353, 373 (Bankr.D.N.J. 2007) (granting Trustee's request for order to search debtor's home for artwork not disclosed in bankruptcy schedules based on evidence in state court divorce case that jewelry and art existed).

However, circumstances make it difficult to credit Mrs. Guben's testimony concerning her ignorance of the law. The Debtor is not unsophisticated in such matters; she has a law degree. Moreover, this is not her first bankruptcy filing. Considering it to be highly relevant, the Court, at the conclusion of the trial, reviewed Mrs. Guben's 1997 bankruptcy file.[5] The Court's purpose in doing so was to ascertain whether she had disclosed owning artwork in the previous proceeding.[6] As it turns out, she did: Schedules B and C from that case listed artwork,

---

[5] At trial the Court inquired of Debtor's counsel as to the content of the schedules in the Debtor's prior case, however, her counsel had no knowledge of them.

[6] The Court may and shall take judicial notice of the schedules from the Debtor's prior case. *See* F.R.E. 201 made applicable by B.R. 9017. There is no dispute as to what appears in that earlier

(continued...)

albeit valued it at a nominal $500, and claimed it as exempt. *See* Case No. 97-19408, Schedules B and C. Having disclosed the ownership of $500 in artwork ten years ago it is, in the opinion of the Court, utterly disingenuous for Mrs. Guben to claim that she didn't think she was required to disclose the ownership of artwork costing $6500 now. Her failure to disclose owning <u>any</u> artwork rather compellingly demonstrates Mrs. Guben's willful attempt to evade payment of her taxes.

*Summary*

A fundamental purpose of the Bankruptcy Code is to permit an honest debtor to reorder his or her financial affairs and obtain a fresh start free from the weight of oppressive, preexisting debt. *In re Giquinto*, 388 B.R. 152, 164 (Bankr. E.D.Pa. 2008). Certainly, Mrs. Guben is not the stereotypical "tax cheat" whose financial dealings occur within what is sometimes referred to as the "underground economy." *See, e.g., U.S. v. McGill*, 964 F.2d 222, 230 (3d Cir.1992) (offering as examples of systematic, intentional evasion: placing assets in the name of others; dealing in currency; causing receipts to be paid through and in the name of others; and causing debts to be paid through and in the name of others) Indeed, the Court notes that the Gubens apparently made significant payments against their tax obligations over the years. That, however, does not compel the conclusion that Mrs. Guben has dealt honestly with the Bankruptcy Court or her creditors. To the contrary, the evidence shows Mrs. Guben to have wilfully failed to remit tax payments and wilfully acted untruthfully with regard to both the IRS

---

[6](...continued)
disclosure, therefore there is no prejudice posed to the Debtor in considering it here. *See In re Indian Palms Assoc.*, 61 F.3d 197, 205 (3d Cir.1995) *citing* F.R.E. 201(f) advisory committee note (1972 proposed rules)).

as well as the Bankruptcy Court. It would appear that Mrs. Guben elected to take the law into her own hands in an effort to compel the IRS to compromise her tax debt. This was a misguided decision and outweighs the fact of her having tried, via negotiation and payment, to retire the debt. The totality of her conduct demonstrating wilful evasion, Mrs. Guben's tax debt will be declared non-dischargeable.

By the Court:

Stephen Raslavich
Chief U.S. Bankruptcy Judge

Dated: August 14, 2008